JUDGE CHIN

08 CV 03418

BLANK ROME, LLP
Attorneys for Petitioner
VOC BULK SHIPPING (USA) INC.
LeRoy Lambert (LL-3519)
Brian S. Tretter (BT-6037)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

VOC BULK SHIPPING (USA) INC.,

Petitioner,

-against-

RENSSELAER IRON & STEEL, INC.,

Respondent.

08 Civ.

**PETITION TO CONFIRM
ARBITRATION AWARD**

---

Petitioner, VOC BULK SHIPPING (USA) INC. ("Petitioner"), by its attorneys Blank Rome, LLP, complaining of the above-named Respondent, RENSSELAER IRON & STEEL, INC. ("Respondent"), alleges upon information and belief as follows:

1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has admiralty jurisdiction under 28 U.S.C. §1333. The Court also has "federal question" jurisdiction pursuant to 28 U.S.C. §1331.

2.    At all material times, Petitioner was and now is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 78 Southfield Avenue, Stamford, Connecticut.

3.    Upon information and belief, at all material times Respondent was and is a New York Corporation with its offices at 35 Riverside Avenue, Rensselaer, New York.

4.    At all material times, Petitioner was the disponent owner of the M/V WISDOM C (the "Vessel"), an ocean-going cargo vessel. By a charter fixture dated October 26, 2004, which incorporated by reference the time charter of the Vessel dated January 9, 2004 (collectively "the Charter"), Petitioner chartered the Vessel to Respondent for a minimum period of 55 days . A copy of the Charter is attached to this Complaint as Exhibit "A".

5.    During the performance of the charter, a dispute arose between the parties as to the suitability of the cranes aboard the Vessel.

6.    Respondent withheld hire under the charter in the amount of $177,023.03 based upon their objections to the suitability of the cranes described above.

7.    Accordingly, Petitioner commenced arbitration in London pursuant to the terms of the Charter. Specifically, clause 17 of the Charter provides as follows:

> (1)    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London with English law to apply, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be men conversant with shipping matters and affairs.

8.    In response to Petitioner's demand for arbitration and its appointment of Alan Oakley as arbitrator, Respondent appointed Mark Hamsher as its nominated arbitrator. The two appointed arbitrators selected Bruce Harris to act as the third arbitrator. Petitioner acted via its solicitors, MFB in London. Respondent acted on its own behalf in the proceeding.

2

9.     Both parties submitted claims submissions to the Panel, which the Panel considered.

10.     On January 3, 2008, the arbitration panel issued an award (the "Award") as follows:

> (1)     **WE FIND AND HOLD** that the owners'[Petitioner's] claim for $177,023.03 succeeds in full.

> (2)     **WE THEREFORE AWARD AND ADJUDGE** that the charterers [Respondent] shall forthwith pay to the owners [Petitioner] the sum of $177,023.03 (One hundred and seventy-seven thousand and twenty-three United States Dollars and three cents) together with interest thereon at the rate of 9.25% (nine and one quarter per cent) per annum, compounded at three-monthly rests, from 15 January 2006 down to the date of payment hereunder.

> (3)     **WE FURTHER AWARD AND DIRECT** that the charterers [Respondent] shall bear and pay their own and (on the standard basis) the owners' [Petitioner's] costs of this reference (and we reserve to ourselves the right to assess and make a further Award in respect of the amount of such costs), together with the costs of this Award which we hereby fix in the sum of £6,615 (Six thousand six hundred and fifteen Pounds Sterling) **PROVIDED** that if, in the first instance, the owners [Petitioner] shall have paid any amount in respect of the costs hereof they shall be entitled to immediate reimbursement from the charterers [Respondent] of the sum so paid.

> (4)     **WE FURTHER AWARD AND DIRECT** that the charterers [Respondent] shall pay the owners [Petitioner] interest on the sums in paragraph 3 above at the rate of 7.50% (seven and one-half per cent per annum compounded at three-monthly intervals from the date hereof in the case of owners' [Petitioner's] costs and from the date of any payment by the owners [Petitioner] to us in respect of the costs hereof until, in each case, the date of payment by the charterers [Respondent] to the owners [Petitioner] of the sums in question.

11.    The Award further provided as follows:

(5)    **WE RESERVE** for later determination by ourselves owners' [Petitioner's] claim for indemnity: to that extent this Award is interim in the reference, but is **FINAL** as to what it decides.

12.    A true and accurate copy of the Award is attached to this Complaint as Exhibit "B".

13.    On or about February 15, 2008, Petitioner's London solicitors made an application to the Panel for an assessment of Petitioner's costs.

14.    Respondent did oppose the calculation of costs made by Petitioner's London solicitors.

15.    Exercising the right reserved in paragraph (3) of the Award, the Panel made a further award on costs dated March 10, 2008 (the "Award on Costs"). The Award on Costs provides:

> **WE ASSESS AND DETERMINE** the Owner's [Petitioner's] costs on the basis set out in section 63(5) of the Arbitration Act 1996 in the total amount of £11,184.66 and no more;
>
> **WE THEREFORE AWARD AND ADJUDGE** that the Charterers [Respondent] shall forthwith pay to the Owners [Petitioner] the said sum of £11,184.66, together with interest on the said sum at the rate of 7.5% per annum or pro rata compounded at three monthly rests from January 3, 2008; and
>
> **WE FURTHER AWARD AND ADJUDGE** that the Charterers [Respondent] shall bear and pay the costs of this Award on Costs which we hereby determine an assess in the sum of £2,310 inclusive of our fees and interlocutory charges in relation hereto, provided always that if, in the first instance, the Owners [Petitioner] shall have paid any amount in respect of the costs of this Award they shall be entitled to immediate reimbursement by the Charterers [Respondent] of any sum or sums so paid, together with interest thereon at the rate of 7.5% per annum or pro rata compounded at three monthly rests from the date of payment by Owners [Petitioner] to us until the date of reimbursement.

16.     A true and accurate copy of the Award on Costs is attached to this Complaint as Exhibit "C".

17.     The Award and Award on Costs are final and not subject to any further appeal.

18.     Petitioner hereby petitions this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et. seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et. seq.* (the "New York Convention"), for an order confirming the Award in favor of Petitioner and against Respondent.

19.     Both the United States and the United Kingdom, the country in which the Award was rendered, are signatories to the New York Convention.

20.     Jurisdiction is proper in this Court pursuant to 9 U.S.C. § 203.

21.     Venue is proper in this Court pursuant to 9 U.S.C. § 204.

22.     No grounds exist for refusal or deferral of recognition or enforcement of the Award against Respondent.

23.     For the foregoing reasons, this Court should enter judgment in favor of Petitioner and against Respondent recognizing and enforcing the Award in the amount of $177,023.03, plus £20,109.66 (to be converted to dollars at the time of judgment), plus interest as per the Award and the Award on Costs.

24.     Petitioner hereby reserves the right to further petition this Court to confirm any further Award of interest or costs which may be rendered in respect of this matter.

**WHEREFORE**, Petitioner prays:

A.     That the Award and Award on Costs be recognized and that judgment be entered against Respondent, and in favor of Petitioner in the amount of $177, 023.03, plus £20,109.66 (to be converted to dollars at the time of judgment), plus interest as per the Award and the Award on Costs;

B.     That Petitioner be granted such other, further and different relief as may be just and proper.

Dated: New York, New York
       April 7, 2008

                            Respectfully submitted,
                            BLANK ROME, LLP
                            VOC BULK SHIPPING (USA) INC.

                     By_____

                            LeRoy Lambert (LL-3519)
                            Brian S. Tretter (BT-6037)
                            405 Lexington Avenue
                            New York, NY 10174
                            (212) 885-5000

# EXHIBIT A

WISDOM C /RENSSELAER
C/P   10/26/04
TCT WITH SCRAP
USEC /MED

REF:   RE4398303

FROM: JOHN F. DILLON & Co.
DATE: 10/26/2004
TIME: 5:35:42 PM

Kevin/Rob

re: Wisdom C

plsd to confirm clean fixing as folls:

- M.V. Wisdom C descr as attached except amend to 4x20t crns plus
  1 x 25t crane
- a/c Rennselaer Iron and Metal
- dely dolsp Newark, N.J. ATDNC
- laycan OCT 26 2100 HRS/28 2400 HRS
  VSL EST SAIL TONIGHT 2030 - DLOSP WOULD BE 1-1.5 HRS LATER
- 1 tct via sp(s) sb(s) sa(s) usec and Med
- intended cargo scrap in bulk xmbt
- redel dop 1 sp Italy pico atdnshinc
- hire usd 26,000 daily inclot
- c/v/e usd 1500 pmpr
- ilohc usd 5000 l/sum

BOD AS O/B. EST ABT 395 MT IFO AND ABT 65 MDO.
PRICES USD 210 PMT IFO AND USD 450 PMT MDO.
CHRTS TO RDEL WITH SAME QUANTS AS ACTUALLY ON DELY.
SAME PRICES BENDS

- otherwise Wisdom C c/p dtd 9JAN04 with logical alterations only
(attached)
- 5 ttl JFD incl 3.75 adcom

OWNERS CONFIRM:
VSL IS FULLY P AND I COVERED AND REMAINS SO FOR THE DURATION
OF THIS VOYAGE

VSLS CLASS IS HIGHEST LR OR EQUIVALENT

VSL IS ITF FTD

VSL IS SUITABLE FOR GRAB DISCHARGE

VSL IS STEEL FLOORED THROUGHOUT

VSLS HOLDS ARE CLEAR AND UNOBSTRUCTED

VSL IS A SINGLE DECK BULK CARRIER WITH ENG/BRIDGE AFT

VSL HOLDS ALL NECESSARY CERTIFICATES FOR THE TRADE

VSLS GEAR SERVES FIVE HOLDS SIMULTANEOUSLY AND ALL HO/HA INDEPENDENTLY
AND COVERS AND REACHES ALL PARTS OF THE HO/HA.

VSL IS NOT A CAR BC OR A CONTAINER BC NOR HAS VSL EVER BEEN A

CAR BC OR A CONTAINER BC.

VSL HAS NO STANCHIONS OR CENTERLINE BULKHEAD.

e n d

Best Regards,
Rob Edmiston
PH: 203 327-2900
MOB: 203 536-5929

 
wisdomc.TIF  wisdomcp.TIF

18- 2-04;14;43   ;LIGHTSHIP CHARTERING                    ;+46 4240077

# Time Charter

## GOVERNMENT FORM

### Approved by the New York Produce Exchange
November 6th, 1913 • Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in ...Copenhagen........................................9th day of ...January,........................ 19 2004
2  Between *Panocean Shipping Co., Ltd., Seoul*..............................................................................................................
3  *Disponent* Owners of the good ..............................Steamship/Motorship *""WISDOM C""* *(See Description Clause 31)* ........ of ..............
4  of.............................. tons gross register, and ...................................... tons net register, having engines of ...................... indicated horse-power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed...........................................................
6  at.............................. of about...................... cubic feet bale capacity, and about...................... tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of...................... feet...................... inches on...................... Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about......................tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about...................... knots on a consumption of about...................... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,
11 now *trading* ............................................................................................................................................................
12 .............................................and *VOC Bulk Shipping Inc. USA* ...................... Charterers of the City of ...........................

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about a period time charter of about 4 months to about 6 months ("about" means 15 days more or less in Charterers' option),
15 trading via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible, always within 1WL, NAABSA as per
15 NYPE in River Plate/South Brazil not North of Victoria only within below mentioned trading limits. BIMCO Standard Double Banking
15 Clause to apply at anchorages. Trading always via ice free ports, vessel not to force ice or to follow icebreakers.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfillment of this Charter Party. *Acceptance of delivery of the vessel shall not constitute any waiver of Owners' obligations*
17 *hereunder.*
18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward seapilot Piraeus*, any time, day or night, Sundays and
18 *Holidays included* ................................................................................................................................................
19 ................................................................................................................................................................
20 in such dock or at such wharf or place (where she may safely lie, always afloat at all times of tide, except as otherwise provided in clause No. 6) as
21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her *arrival first loadport*
21 *delivery to be*
22 ready to receive *any permissible cargo* with clean-swept holds and *throughout the period of this Charter*, vessel to be (unless caused *by*
22 *Charterers' or their agents' fault)* tight, staunch, strong and in every way fitted for the *ordinary cargo service*, having water ballast, winches and
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, including petroleum or its products in proper containers, excluding *cargoes listed in Clause 42* ...............................................
26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number or deck of Halifax,
27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29 Mexico, and/or South America, ........................................................................................and/or Europe
30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31 October 31st and May 15th, Hudson Bay and all unsafe ports, like excluding, when out of season, White Sea, Black Sea, and also Baltic,
32 *Trading exclusions: See Clause 99* .................................................................................................................
33 ................................................................................................................................................................
34 ................................................................................................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36 1.   That the Owners shall provide and pay for all provisions, *fresh water*, wages *including all officers' and crew overtime* and consular
36 shipping and discharging fees of the Crew; shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with current*
38 *requirements at ports of call* for and during the service. *However, it is understood that efficient state in hull does not include bottom*
38 *fouling resulting from prolonged stay in ports, anchorages or idling under Charterers' arrangements/orders.*
39 2.   That whilst *on hire* the Charterers shall provide and pay for all the fuel except *lubricating oil* as otherwise agreed, Port Charges, Pilotages,
39 Agencies *for clearance and cargo work only*, Commissions, canal dues, river tolls, *tugage,*
40 Consular Charges (except those pertaining to *sign on/off* the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which *Owners* are vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account, Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All other fumigations to be for Charterers account, unless vessel has been on charter for a continuous period
44 of six months or more.
45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

18- 2-04\14\43   ;LIGHTSHIP CHARTERING                                    !-43 48450770        * 2/ :

47  for dunnage, they making good any damage thereto.
48  2.   That the Charterers, at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ....................................................tons and not more than
50  .......................................tons and to be redelivered with not less than ...................................................tons and not more than .....................tons. See Clause 30.
51  4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD*           *per day/pro rata including overtime*
52  *payable every 15 days in advance in* United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on .....................................................summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) *at* on dropping last outward sea pilot *a safe port in Charterers' option*
56  *within Singapore/Japan range OR Skaw/full Mediterranean, including Black Sea range at any time day and night, Sundays*
57  *and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/12* days *approximate*
57  notice of vessels expected date of re-delivery, and probable port *and 7/5/3/2/1 days notice with definite port. Charterers to keep Owners*
57  *advised of vessel's movements and notify Owners immediately of unforeseen delay.*
58  5.   Payment of said hire to be made *to Owners' bank as per Clause 29(G)* in New York in cash in United States Currency, *every 15 days*
58  semi-monthly in advance, and for the last *15 days* half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it became
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers; otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents, may
69  direct, provided the vessel can safely lie always afloat at any time of tide. , except at such places where it is customary for similar size vessels to safely
70  lie aground.
71  7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow. Charterers
74  paying Owners ......................................................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers.*
76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards *vessel's* employment and
78  agency; and Charterers are to load, stow, and trim, *fully and discharge, lash, secure, unsecure, dunnage/undunnage and weigh* the cargo, *see*
79  *Clause 87,* at their expense under the supervision of the Captain, who is to sign Bills of Lading for
79  cargo as presented, *unless Charterers are making use of their authority to sign as per Cl. 50,* in strict conformity with Mate's or Tally Clerk's
79  receipts.
80  9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10.   That the Charterers shall have permission to appoint a Supercargo, *who is to sign the usual Letter of Indemnity for passengers;* who
82  shall accompany the vessel *subject to lifeboat capacity permit* and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84  rate of *$10.00* 1.00 per day, *per person for such accommodation and victualling excluding wines and spirits.* Owners to victual Pilots and
84  Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers *paying Owners* lumpsum USD 1,500.00 *per month/pro rata* paying at the current rate per meal, for
85  all such victualling, *cable & entertainment.*
86  11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *in English* and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a *legible* true copy of daily *deck and engine Logs in English*, showing n.c. the course of the
88  vessel and distance run and the con-
89  sumption of fuel.
90  12.   That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation only.*
91  13.   That the Charterers shall have the option of continuing this charter for a further period of .................................................
92  ..................................................................................................................................................................................................................
93  on giving written notice thereof to the Owners or above Agents..................................................days previous to the expiration of the first-named term, at any declared option
94  14.   That if required by Charterers, time not to commence before *is*    ...................................................................and should vessel
95  not have given written notice of readiness on or before ......................................ry ...................................................... but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Lay/can to be narrowed by Owner:*
96  *latest by 12th January, 2004 into 15 days' spread and by 23rd January into 10 days' spread.*
97  15.   That in the event of the loss of time from deficiency *and/or default* of crew men, officers or Owners' servants or deficiency of stores
98  fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, *unless resulted from inherent vice,* drydocking for the purpose of examination or painting
98  bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; *and all extra expenses may be deducted from th.*
99  *hire* and if upon the voyage the speed be reduced by

18⁻  2⁻04713143   ,LIGHT3RIP CHARTERING

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all *extra directly related justified* expenses shall be deducted from the hire. *Any stevedore and/or labour charges for breakdown*
101  *of vessel's equipment not caused by Charterers to be for Owners' account, but maximum one shift.*

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London with English*
107  *Law to apply.* New York,
108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping commercial men conversant with*
109  *shipping matters and affairs.*

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116  York-Antwerp Rules *1994* ~~or any amendments~~ in London, ~~1924, at such port or place in the United States as may be selected by the carrier, and as to~~
116  ~~matters not provided for by those~~
117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
121  ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
122  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon shall, if~~
123  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
124  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
125  ~~place of adjustment in the name of the adjuster, pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
~~United States money.~~
126  ~~In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~

132  Provisions as to General Average in accordance with the *New Jason Clause (as attached)* ~~above~~ are to be included in all bills of lading issued
132  hereunder. *It is understood that the Charter hire is not to contribute to General Average.*

133  20.  Fuel used by the vessel while off hire, ~~also for cooking, condensing water of for grates and stoves~~ to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135  ~~21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting and payment of the hire to be suspended until she is again in proper state for the service.~~
138  *Vessel not to be drydocked whilst performing this Charter, except in case of emergency.* ...................................................................

139  .............................................................................................................................................................................................

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* ~~booms~~) capable of handling lifts up to as *specified in*
140  *Clause 36.* Owners to provide on the vessel sufficient light clusters as on board for night work at all hatches simultaneously,
140  free of charge to Charterers and are to maintain same in *efficient* working condition throughout this Charter. Three tons, and
~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
~~same, otherwise equipment and gear for handling lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over three on board to be at Charterers' expense.~~ The
144  Charterers to have the use of any gear on board the vessel.

145  23.  Vessel to work night and day, *Sundays and holidays included,* if required by Charterers, and all *cranes* ~~winches~~ to be at Charterers' disposal
145  during loading and discharging.
146  ~~Steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rule of the~~
148  ~~port, or labor unions prevent crew from driving winches,~~ Competent shore *crancmen* ~~winchmen~~ to be *employed and paid* by Charterers. In the event of
148  a disabled *crane* ~~winch~~ or *cranes* ~~winches~~ or
149  insufficient power to operate *cranes* ~~winches,~~ Owners to *hire and* pay for shore engine, or engines, in lieu thereof, if required, ~~and pay no less of hire~~
149  ~~as claimed~~
150  thereby.  *All cranes to be at Charterers' disposal at all times during loading and discharging operations.*

151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. ~~It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder~~
155  U. S. A. Clause Paramount

156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term or this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall to that extent, but no further.~~
160  Both to Blame Collision Clause

YYJ CO.OT LOOC/17

18- 2-04;14:43    ;LIGHTSHIP CHARTERING

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 25. The vessel shall not be required to enter any icebound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, *acts of pilots and tugboats* and all other matters, same as when trading for their own account.
172 27. A commission of *1.25* ~~2 1/2~~ per cent is payable by the Vessel and Owners to
173 *Lightship Chartering A/S, Copenhagen* ...........................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of *3.75* ~~2 1/2~~ per cent payable to
175 ........................................*Charterers* ...................................................................................... on the hire earned and paid under this Charter.
175
175 *Clauses 29 through 117 inclusive, as attached to be fully incorporated in this Charter Party.*
175
175
175
175

175
175
175
175
175
175

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



**ADDITIONAL CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 9TH JANUARY, 2004**
**MV "WISDOM C" / VOC**

Clause No.29
HIRE PAYMENT CLAUSE



A.    First hire and value of bunkers on delivery to be paid ~~within 3 banking days after~~
vessel's delivery. Hire payment thereafter to be paid every 15 days in advance.
Charterers are entitled to deduct from last sufficient hire payment, duly justified
Owners' disbursements, as well as value of estimated quantities of bunkers on
redelivery.

B.    Where there is any failure to make " PUNCTUAL AND REGULAR
PAYMENT" due to oversight and negligence or error of omission of Charterers'
employees, bankers or agents or otherwise for any reason where there is absence
of intention to fail to make payment as set out, Charterers shall be given by
Owners 3(three) banking days written notice to rectify the failure and where so
rectified, the payment shall stand as "PUNCTUAL AND REGULAR
PAYMENT". If there is a failure of the bank, Charterers to have 2(two) working
days grace to rectify the failure.

C.    In the event that the vessel is expected to be redelivered to the Owners prior to
the expiry of the last 15 days period that would be covered by the next payment
of hire, Charterers shall be entitled to effect payment of hire on the basis of the
estimated time necessary to complete the services.

D.    Cash money drawn by the Master shall be taken at the office of the Port Agents
or shall be drawn by the Master from the bank. In the event that the Master
requests delivery of cash money at the vessel, all risks and expenses involved in
arranging and making such delivery of cash money to the vessel shall be borne
by the Owners.

E.    Notwithstanding anything contained herein to the contrary, it is understood that if
at any time during the currency of this Charter, the hire payment shall become
due on a Saturday, Sunday or holiday or outside normal banking hours, payment
of hire may be made on the next banking day immediately following the date on
which hire became due and such payment shall stand as "PUNCTUAL AND
REGULAR PAYMENT".

F.    Charterers shall have the right to withhold from Charter hire during the period of
this Charter such reasonable amounts due them for off-hire time and Owners
disbursements provided proper supporting statements are to be sent to Owners.

Charterers entitled to reserve US$ 200 per port for Owners expenses from last
sufficient hire payment but all supporting vouchers/documents to be submitted to
Owners latest within 6 months after vessel's redelivery.

18- 2-04;14:45  :LIGHTSHIP CHARTERING                                    ;+45 45480770      #  6/ 3



## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC

G.  BANK FOR HIRE PAYMENT:
    Korea Exchange Bank
    Swift: KOEXKRSE
    Taepyongno Branch, Seoul, Korea
    A/C No.: 544-7-70599 with JP Morgan Chase Bank, New York
    Beneficiary: Pan Ocean Shipping Co., Ltd. A/C No.: 063-JCD-100120

Clause No. 30
Vessel to have on delivery about 700 MT IFO and about 100 MT MDO and to be
redelivered with about same quantities as on delivery. Same prices both ends: US$170
PMT IFO and US$ 280 PMT MDO. Value of bunkers on delivery payable with first hire.
Owners have the right to bunker the vessel for their own account during the currency of
this Charter provided same doesn't interfere with Charterers' operations.

Clause No. 31
Description of Vessel – (all details about):
MV 'WISDOM C'
BULKCARRIER - BLT 1981/BRAZIL
PANAMA FLAG
CLASS: M.R.S.
GROSS/NET INTERNATIONAL : 23.381/12.534
SUEZ : 24.476/19.766,21
PANAMA : 24.591,86/18.930,46
LOA/BEAM : 200,9 M/27,20M
MOULDED DEPTH FM KEEL TO MAIN DECK : 15,20 M
AIR DRAFT IN FULL LADEN CONDITION : 34.40 MTS
DWT/DRAFT IN: S 40204 MT / 11.19 M
T 41331 MT / 11.42 M
W 38000 MT / 10.75 M
F 41460 MT / 11.45 M
TPC 47 MT
HOLDS/HATCHES : 7/7

HOLD WISE GRAIN/BALE CAPACITY IN CBM:

| GRAIN | | BALE |
|---|---|---|
| NO.1 | 4946 | 4645 |
| NO.2 | 8638 | 8120 |
| NO.3 | 5488 | 5155 |
| NO.4 | 8689 | 8165 |
| NO.5 | 5488 | 5155 |
| NO.6 | 8694 | 8170 |
| NO.7 | 5256 | 4940 |
| TTL | 47199 | 44350 |

HATCH DIMS:
NO. 1/3/5/7 : 9,6 X 12,64
NO. 2/4/6 : 17,6 X 12,64

Wisdom C 2949 TC VOC 090104                          - 2 -



**Lightship**
Chartering A/S
CVR 6800016

### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

HOLD DIMS:
NO.1: 15,80 X 19,00 AFT/12,60 FORE
NO.2: 25,20 X 19,00
NO.3: 15,60 X 19,00
NO.4: 25,20 X 19,00
NO.5: 15,60 X 19,00
NO.6: 25,20 X 19,00
NO.7: 15,80 X 19,00 FORE/16,00 AFT

TANK TOP STRENGTH : 22,5 MT/SQM
DECK : 2,0 MT/SQM
HATCH COVER : 1,6 MT/SQM

TYPE OF HATCHCOVER : MACGREGOR FOLDING
CARGO GEAR : 3 CRANES X 20 TONS - 2 CRANES X 25 TONS

VESSEL IS SUITABLE FOR MECHANICAL GRABS ONLY IN CASE OF
MECHANICAL GRABS ARE USED FOR LOADING AND/OR DISCHARGING
THE CARGO BY THE VESSEL'S GEAR, THEN TOTAL WEIGHT OF
THE GRABS PLUS CARGO NOT TO EXCEED 17MT AND 20MT
RESPECTIVELY FOR THE 20 AND 25 TONS OF THE CRANES, AS
PER GEAR SAFETY REGULATIONS

CO2 FITTED: YES
VENTILATION: NATURAL

SPEED/CONS:
ABT 12K ON ABT 31,00 MT IFO 180 CST PLUS 3 MT MDO - LADEN
ABT 12K ON ABT 30,00 MT IFO 180 CST PLUS 3 MT MDO - BALLAST
AT PORT IDLE 2,5 MT MDO
WHEN CRANES WORKING ABT 3,5 MT MDO

VESSEL BURNS MDO WHEN MANOEUVRING,STANDBY,PASSING
RIVERS/CANALS RESTRICTED AREAS ETC

SPEED/CONS ARE BASIS ON "ABOUT" FIGURES AND UNDER
GOOD WEATHER MAXIMUM 4 BEAUFORT

TYPE OF BUNKERS TO BE SUPPLIED:
IFO (180) CST RME 25, AND MDO,DMB OR MGO, BOTH AS
PER ISO FUEL STANDARD 8217/1996

ALL DETS ABT AND WOG

SEE ALSO ATTACHED QUESTIONNAIRE

Clause No. 32
Basic Annual War Risk Insurance includes C.W.R.I. to be for Owners account. In the
event Charterers employ the vessel on a trade for which there is additional premium for H
& M, Officers/crew WRI including crew war bonus and blocking + trapping as imposed

.- - -..-.-.  ,..-..-..-. -..-..-.-..  .-.- ..-.-..-...                     1-45 45480770        w. 5/



**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**

by war risk underwriters, same to be for Charterers' account and to be paid to Owners on production of Original invoice/relevant vouchers, but not excluding Lloyd's of London Underwriters.

Clause No. 33
Charterers have the benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from Underwriters, by reason of the vessel being in port for a minimum period of 30 days, if on full hire for this period and pro-rata for the time actually on hire.

Clause No. 34
Charterers to have the privilege for flying their own house flag.

Clause No. 35
On and off-hire surveys shall be held jointly between Charterers and Owners by one single surveyor to be mutually agreed. On-hire survey to be held in Owners' time unless vessel has already commenced loading cargo at berth at first load port and off-hire survey to be held in Charterers' time at last discharge port before redelivery. Expenses for on/off-hire survey to be equally shared between Owners and Charterers.

Clause No. 36
Both parties to have the option of cancelling this Charter Party with reasonable notice if war breaks out between any two or more of the following countries to such an extent as to render the continuation of the Charter Party impossible: USA. Great Britain, Japan, USSR, The People's Republic of China, France, Republic of Korea, Greece, North Korea.

Clause No. 37
Should the vessel put back whilst on voyage by reason of an accident or breakdown or deviation upon the course of the voyage caused by sickness of or any accident to the crew or any person on board the vessel other than persons travelling at the request of Charterers, or by reason of the refusal of the Captain or crew to perform their duties, the hire shall be suspended from the time of putting back until she be again in the same position or equidistant position and resumes the voyage.

Bunkers consumed during the period shall be for Owners' account. Especially the following events to be deemed as off-hire until the vessel be again in the same or equivalent position and resumed the voyage: -

    a) In the event of deviation from landing invalid crew and/or stowaway and from salvage.
    b) In the event of loss of time from strike of the crew.
    c) In the event of deviation by alleged oil pollution.
    d) Unless caused by Charterers and/or their servants and/or their instruction.

, 16- 2-04;14:43 ;LIGHTSHIP CHARTERING                    ;-4B 45480770      # 9/ 37



**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**

Clause No. 38
STEVEDORES DAMAGE CLAUSE:
Any damage caused by stevedores during the currency of this Charter Party shall be
reported by the Master to the Charterers or their agents, in writing, within 24 hours of the
occurrence or as soon as possible thereafter except hidden damages which to be reported
when discovered but latest on completion of discharge. The Master shall use his best
efforts to obtain written acknowledgement by responsible parties causing damage unless
damage should have been made good in the meantime stevedore damages affecting
class/sea worthiness/cargo gear worthiness to be repaired on occurrence at Charterers'
time and expenses and in accordance with class requirements. In case of hidden damages
same to be reported latest on completion of discharge. Charterers can redeliver the vessel
without repairing any stevedore damages incurred during the currency of the Charter
Party, provided this does not affect class/seaworthiness/cargo gear worthiness but
Charterers undertake to reimburse Owners for actual expenses incurred on stevedore
damage items as identified per on and off-hire survey reports against invoices issued by
shipyard or workshop or Master's statement in case repairs for such damages will be
carried out by crew. Any time spent in repairing stevedore damage shall be for the
Charterers' account. The Charterers shall pay for stevedore damage whether or not
payment has been made by stevedores to the Charterers.

Clause No. 39
Vessel to be delivered with valid deratization or deratization exemption certificate on
board, and if this does not cover the whole period of time charter, Owners undertake to
carry out all necessary steps to renew such certificate and costs of same and detention to
be for Owners' account except as provided for in Clause 2

Clause No. 40
Charterers have the liberty to fumigate the cargo on board at loading and discharging
port(s) or places enroute at their risk time and expense.

After fumigation and prior vessel sailing Charterers are to provide gas free certificate. If
due to fumigation officers/crews must be accommodated in hotel all expenses including
victualling to be for Charterers' account.

Clause No. 41
Vessel to possess the necessary certificates with current regulations in force by the day of
fixture to comply with safety and health regulations and current requirements at all ports
of call.

Owners confirm vessel has on board following certificates: Cargo Ship Safety
Construction Certificate, Cargo Ship Safety Equipment Certificate, Cargo Ship Safety
Radio Certificate. Also have International Load-line Certificate issued by vessel's class,

, 00.9%                                                    ,27/2006 10:41 FAX



**Lightship**
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

Shipboard Oil Pollution Emergency Plan and vessel is also covered by P & I Club (The London Steamship Owners' Mutual Insurance Association Ltd. Managers – A. Bilbrough, London) who covers vessel for pollution damage in all other places. Vessel to have sufficient certificate as per regulation of calling port. It is understood that vessel has all flag/international/Class Certificates. Should any special/local certificate be required for a particular trade, then Charterers to give Owners sufficient notice in order to prepare the same.

Clause No. 42
Cargo Exclusions:
No dangerous and/or inflammable and/or injurious cargo. No cargo listed in the IMO Blue Books (IMDG Code) including but not limited to the following: Acids, ammonium nitrate, arms and ammunition, asbestos, asphalt, bones and bone meals, borax, calcium carbide, calcium hypochlorate, caustic soda, Chilean nitrates, coffee cocoa, containers, cotton, creosoted goods, explosives, Ferro silicon, fishmeal, granita blocks, hides, linseed oils, livestock, logs, lime, milled rice, paddy rice, manioc and manioca pellets, mobile homes, motor vehicles, motor blocks, motor spirits, mineral sands, naphtha, Niger seeds, nuclear materials and radio active waste, oil cakes, petroleum and its products including quebracho or extracts, radio isotopes, salt cake, sand and all its by-products, slurry, soda ash, sponged iron, sunflower seed expellers and other expellers, tar, turnings, turpentine, yachts. Owners not to be responsible for any contamination and/or damage to cargo which may arise due to mixed cargo loaded in same hold.
All cargoes to be lawful/harmless and always to be loaded/stowed/carried and discharged in strict accordance with local/national and IMO regulations, any extra fittings/equipment /etc which are required to observe such regulations to be undertaken by Charterers at their time/expense.

Direct reduced iron ore and its products including HBI, Hot Briquette iron ore, pond coal to remain as excluded cargoes.

Charterers are allowed to load maximum one cargo out of cement/cement clinker during this period provided same not loaded in consecutive voyages and not to be the last cargo.

Charterers are allowed to load maximum one cargo of concentrates provided same to be loaded/carried/labelled/stowed/discharged in accordance with IMO and/or local authorities regulations/recommendations and certificate of water contents to be within safety margin for water transport as ascertained by IMO Code.
Charterers are fully responsible for all time/cost/expenses pertaining to the carriage of concentrates including but not limited to certification/surveys required for carriage of this cargo.
Should any damage to the paint in vessel's holds occur as a result of loading such cargo, then Charterers to provide Owners with paints required to re-paint the vessel's holds at Charterers expense.

Wisdom C 2949 TC VOC 090104                    - 6 -

. 18- 2-04;14:48  :LIGHTSHIP CHARTERING                    ;745 48480/70   - ... ..

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC

**Lightship**
Chartering A/S
GVR 86900114

Charterers are allowed to load maximum one cargo of sulphur and one cargo of salt but prior loading salt and sulphur Charterers to arrange and pay for a suitable lime coating, if required by Master/Owners, to Master's satisfaction and likewise arrange and pay removal of same after discharge. Such cargoes not to be loaded in consecutive voyages and not to be the last cargo prior redelivery.

Charterers are allowed to load maximum one cargoes of HMS 1+2 or shredded scrap, non-oily and always excluding MBT, Charterers to observe soft loading Clause whereby first layers of scrap to be gently lowered and loaded on vessel's tank top forming a cushion prior balance cargo loaded to Master's satisfaction. When scrap loaded, the first load/layer of scrap in each hold to be lowered as low/close as possible to bottom of the hold to provide a proper flooring and cushion for loading balance cargo to Master's satisfaction. Scrap not to be last cargo prior redelivery.

Charterers are allowed to load maximum one cargoes of non-oily/non-hazardous petcoke provided cleaning including supply of detergents as required to be entirely at Charterers' risk and expense. Petcoke not to be last cargo prior redelivery.

Vessel not to load any cargoes that require DPC survey in Brazil.

Pitch is excluded, but Owners agree to load pencil pitch in Bulk in maximum 2 holds only for maximum three times only provided:

(A) Charterers to give about one month's notice of such intention
(B) Charterers confirm that the cargo will be loaded and discharged in accordance with IMO regulations.
(C) Such cargo not to be the last cargo prior redelivery.

Clause No. 43
Charterers to have the option of holding a superficial inspection at any time, Owners or Master giving every facility to carry it out.

Clause No. 44
Owners undertake that the vessel will be furnished with a certificate of Financial Responsibility as may be required under the United States Water Quality Improvement Act of 1970 and any amendments thereto.

Clause No. 45
Baltic Conference War Risks Clause for Time Charters 1993.
(Code name: 'Conwartime 1993')

1. For the purpose of this Clause, the words:

18- 2-04;14:45    ;LIGHTSHIP CHARTERING                    ;+45 45480770    P 12/ 37



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

  a) Owners shall include the Ship-Owners, bare-boat Charterers, disponent
     Owners, Managers or other operators who are charged with the management
     of the vessel, and the Master; and

  b) "War Risks" shall include any war (whether actual or threatened), act of war,
     civil war, hostilities, revolution, rebellion, civil commotion, warlike
     operations, the laying of mines (whether actual or reported), acts of piracy,
     acts of terrorists, acts of hostility or malicious damage, blockades (whether
     imposed against all vessels or imposed selectively against vessels of certain
     flags or ownership, or against certain cargoes or crews or otherwise
     howsoever), by any person, body, terrorist or political group or the
     Government of any state whatsoever, which, in the reasonable judgement of
     the Master and/or the Owners, may be dangerous or are likely to be or to
     become dangerous to the vessel, her cargo, crew or other persons on board the
     vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not be
   ordered to or required to continue to or through, any port, place, area or zone
   (whether of land or sea), or any waterway or canal, where it appears that the vessel,
   her cargo, crew or other persons on board the vessel, in the reasonable judgement of
   the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.
   Should the vessel be within any such place as aforesaid, which only becomes
   dangerous, or is likely to be or to become dangerous, after her entry into it, she shall
   be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any
   blockades, whether such blockade be imposed on all vessels, or is imposed
   selectively in any way whatsoever against vessels of certain flags or ownership, or
   against certain cargoes or crews or otherwise howsoever, or to proceed to an area
   where she shall be subject, or is likely to an belligerents right of search and/or
   confiscation.

4.

  a) The Owners may affect war risks insurance in respect of the Hull and
     Machinery of the vessel and their other interests (including, but not limited to,
     loss of earnings and detention, the crew and their Protection and Indemnity
     Risks), and the premiums and/or calls therefor shall be for their account.

  b) If the Underwriters of such insurance should require payment of premiums
     and/or calls because, pursuant to the Charterers' orders, the vessel is within, or
     is due to enter and remain within, any area or areas which are specified by
     such Underwriters as being subject to additional premiums because of War

YYↃ 7ⅿ:0T 6ꞐꞐ2/I2/

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

Lightship Chartering A/S

Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners becomes liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in th manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

   a) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions:

   b) To comply with the orders, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance:

   c) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement:

   d) To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier.

   e) To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of



### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

The Baltic Conference War Risks Clause for Time charters 1993 (Code Name: 'Conwartime 1993'), P & I Bunkering Deviation Clause, New Jason Clause, New Both-to-Blame Collision Clause, General Clause Paramount, shall be incorporated in the Charter Party and all Bills of Lading issued hereunder excluding 'Conwartime 1993' (in the Bills of Lading) which to be replaced by the 'Voywar 1993'.

Clause No. 46
Vessel's holds on delivery to be clean, swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects, free of salt, loose rust scale and previous cargo residue to the satisfaction of the on-hire surveyor. If vessel fails to pass hold inspection, then vessel to be placed off-hire from the time of such rejection until the time vessel's holds are passed, prorata should loading commence in holds already passed.

Charterers have the option to redeliver the vessel without cleaning holds with Charterers paying US$ _____ lumpsum including all dunnage, lashings, debris removal and disposal.

In case Charterers have supplied vessel with dunnage and vessel calling US waters/ports, Charterers to take appropriate steps in advance for the disposal of same.

Any intermediate hold cleaning (s) if required by Charterers shall, in Charterers' option, be performed by either the vessel's crew or by sore labour at Charterers' time/expense. If Charterers request services of crew for intermediate cleaning then this cleaning to be performed only whilst vessel is enroute to next loading port, provided the time of ballast leg is sufficient for the work and the weather suitable, or at port provided shore regulations permit. If this option is declared then Charterers are to pay Owners US$ . _ _ per hold/per occasion.

All intermediate cleaning, even if effected by crew, is carried out at Charterers' risk and in Charterers' time, and should vessel's holds be subsequently rejected and any further cleaning etc be required, then these expenses and time used always to be for Charterers' account.

Any special equipment and/or materials/chemicals etc which may be required for hold cleaning are always to be provided and paid for by Charterers.

18- 2-04;14:43  ;LIGHTSHIP CHARTERING                    ;+45 45480770      # 16/ 37

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC



**Lightship**
Chartering A/S

### Clause No. 47
Owners to advise Charterers full name of Master when fixture is confirmed (reverting) and Owners to give advance notice to Charterers with full name of new Master when Owners decide to change Master.

### Clause No. 48
Charterers to undertake to keep Owners and Master informed during the period as regards the itinerary of the vessel and the name of their agents at ports of call.

### Clause No. 49
When required by Charterers, Owners to appoint their own agents at ports of call to attend husbandry matters, immigration formalities and other requirements concerning crew, but Charterers will do their utmost to let Owners use their own agents for the normal practice without paying additional agency fee but actual cost incurred to be paid by Owners as per tariff of the port of call.

### Clause No. 50
Charterers' Bill (s) of Lading to be used and the Master to release to the Charterers or their agents his authority to sign Bill (s) of Lading on his behalf, provided in strict conformity accordance with Mate's Receipts.
No through, transshipment or combined transport or liner Bills of Lading and no Waybills are to be issued under this Charter Party.

### Clause No. 51
If the vessel calls at any US port for the purpose of loading or discharging cargoes, vessel's cargo gear and all other equipment shall comply with the regulations established by US Public Law 85, 742, part 9 (Safety and Health Regulations for Longshoring).

If longshoremen are not permitted to work due to failure of the Master and/or Owners and/or Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom and additional expenses accruing as a result to be for Owner's account.

### Clause No. 52
Owners confirm that vessel's crew are employed under the terms of POEA (Philippines Overseas Employment Agreement).

### Clause No. 53
Opening and closing of hatches to be always done by crew members free of expense to Charterers, if permitted by local port regulations, otherwise shore labour employed for Charterers' account.



### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

**Clause No. 54**
Owners or Master to advise Charterers and Charterers agents at first loading port, if known, expected time of delivery and expected quantities of IFO and MDO remaining on board at time of delivery.

**Clause No. 55**
Owners' P & I Club: The London Steamship Owners' Mutual Insurance Association Ltd. Charterers have the benefit of Owners P & I Club so far as the rules permit.
Notwithstanding anything that may be contained in this Charter Party to the contrary, it is expressly agreed that the Owners shall remain responsible for and indemnify the Charterers against all claims arising in connection with loss of life, personal injury or similar claims.

**Clause No. 56**
Throughout the period of this Charter, vessel will have on board current valid and up-to-date Panama Canal Admeasurement Certificate and will so comply with all applicable requirements, regulations and recommendations of the Canal Authority so as to avoid any delay in transit of the Panama Canal.

Any delay caused by non-compliance with the aforesaid or lack of proper documentation and/or certificate and/or equipment and fittings required transit the Panama/Suez Canal will be considered off-hire and all directly related expenses resulting from such delay, including bunkers consumed during that period will be for Owners' account.

**Clause No. 57**
If the vessel is off-hire for consecutive period of 20 days, Charterers have the right to cancel this Charter Party without any further obligation under this contract on the part of Charterers, provided no cargo remaining on board.

**Clause No. 58**
Any taxes on vessel levied by country of vessel's registry, flag, Ownership and Owners' nationality to be for Owners' account. Any and all other taxes to be for Charterers' account.

**Clause No. 59**
In the event of breakdown of cranes by reason of disablement at ship's fault or sufficient power or otherwise, the hire to be reduced pro-rata for the period of such as insufficiency in proportion to the number of cranes that were available at the time of breakdown of equipment.

If Charterers elect to continue work in hatch or hatches affected by breakdown by hiring shore appliances, Owners are to pay for shore appliances subject to Owners approval but not unreasonably withheld by Owners, but in such case Charterers are to pay full hire for



## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC

all time shore appliances are working. Any stevedoring and/or labour charges additionally occurring due to breakdown of vessel's equipment, including costs for standby of stevedore labour to be for Owners' account but upto maximum one shift or next shift which cannot be cancelled.

### Clause No. 60
Owners guarantee that the vessel is cranes equipped with a lifting capacity of as per vessel's description, is a single deck, self-trimming bulk-carrier with engine(s) and bridge located aft.

### Clause No. 61
In case of loss of time due to boycott or picket at any port or place by the shore and/or port labour and/or the tugboat(s) and/or the pilots and/or by Governmental Authority directly attributable to Ownership, and/or the terms and conditions on which members of the officers/crew were employed, vessel then to be off-hired for any time lost thereby and the cost of bunkers consumed during the period to be for Owners' account.

### Clause No. 62
Charterers' option to load intended cargo on deck/hatch cover at Charterers time/expenses/risk in accordance with vessel's deck/hatch cover strength and vessels stability at Master's discretion and that such cargo does not affect the seaworthiness of safe navigability of the vessel in any manner. Any extra fittings required for deck or hatch cargo are to be provided and paid for by the Charterers who are to load, stow, dunnage, lash and secure, unlash, tally such cargo in their time and expenses always to the entire satisfaction of the Master.
The vessel is not to be held responsible for any loss of or damage to the cargo carried on deck.

In the event that cargo is shipped on deck during this Charter, Charterers are to ensure that separate Bills of Lading are issued covering such cargo that those Bills of Lading are claused as follows: -

"Shipped on deck at Charterers'/Shippers' and Receivers' risk, expenses and responsibility, without liability on the part of the vessel, or her Owners for any loss, damage, expenses or delay howsoever caused".

Charterers' option to weld padeyes and deck/hatch cover/in hold at Charterers' time/expense and same to be removed prior to redelivery but Charterers' option to redeliver vessel without removal of padeyes by paying US$ 5.00 per each padeye.
No padeyes to be welded on fuel oil tanks. Any damage to vessel's epoxy coatings on deck and under deck to be repaired at Charterers time, risk and expense to Master's full satisfaction.

Case 1:08-cv-03418-DC    Document 1    Filed 04/07/2008    Page 27 of 57



**ADDITIONAL CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 9TH JANUARY, 2004**
**MV "WISDOM C" / VOC**

Clause No. 63
Cargo claims between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Procedure Exchange Agreement of February 1970, as amended 1996 and any subsequent amendments thereto.
The party having paid the claim shall submit to the other party supporting as soon as possible. No extension to be granted without the knowledge of either party.

Clause No. 64
Vessel is not blacklisted by US Longshoremen's Union.

Clause No. 65
Any delay, expenses and/or fines incurred on account of smuggling if caused by Master, Officers and/or crew to be for Owners' account, conversely to be for Charterers' account if caused by their persons/servants.

Clause No. 66
Owners warrant that vessel is eligible for bunkers in the United States of America and its territories.

Clause No. 67
Charterers and supercargo to have the right of using the vessel's means of communications without charge or expense.

Clause No. 68
No cranemen/winchmen from crew.

Clause No. 69
Charterers to supply fresh water if needed at Owners' account during this Charter except the same used for Charterers' business which to be for Charterers' account.
Fresh water for holds cleaning always for Charterers' account.

Clause No. 70
Vessel burns MDO when manoeuvring, standby, passing rivers/canals restricted areas etc.

Clause No. 71
Owners confirm that vessels' hatch covers are to be watertight all throughout this Charter period and if any hatch cover found defective, same to be rectified at Owners' time and expenses. Charterers also have the right to carry out hose test at any time during this Charter Party.

Clause No. 72
Cargo gear to be in fully efficient state throughout the currency of the Charter Party.

Wisdom C 2949 TC VOC 090104                - 14 -

18- 2-04;14:43 ;LIGHTSHIP CHARTERING



**Lightship** Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

Clause No. 73
Owners warrant that all vessel's holds are clear of any fittings/superstructures such as car deck/curtain plates whatsoever.

Clause No. 74
Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, the hire is to be suspended for any period that the vessel remains under arrest, or remains unemployed as the result of such arrest and Owners shall reimburse to Charterers any directly related and fully substantiated expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of this Clause, the hire is suspended. This Clause is in-operable should the arrest be caused by any act or omission of Charterers or their agents.

Clause No. 75
Owners to allow Charterers to discharge cargoes without presentation of original Bill(s) of Lading by providing Letter of Indemnity in accordance with Owners' P&I club form and wording before discharging. Letter of Indemnity to be signed by Charterers only and copies of relevant Bills of Lading to be attached thereto.

Letter of Indemnity to be issued on Charterers' letterhead signed and stamped by Charterers' authorised person only.

Letter of Indemnity to be faxed to Owners for approval prior to vessel's arrival at each discharging port and original documents to follow in the mail.

Clause No. 76
Master to cable Charterers each third day stating vessel's position, speed and estimated time of arrival next port to be called at.

Clause No. 77
Normal quarantine time and expenses for vessel's entering port(s) to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master/Officers/Crew to be for Owners' account.

Clause No. 78
Watchmen charges, if any, shall be borne, by party arranged/ordered, compulsory watchmen, compulsory garbage removal for Charterers' account.

Clause No. 79
Vessel's cargo gear and all other equipment shall comply with the regulations of the country in which vessel will be employed and Owners to ensure that the vessel is at all



**ADDITIONAL CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 9TH JANUARY, 2004**
**MV "WISDOM C" / VOC**

times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. Gear certificates to be shown to Charterers or their agents if required. For trading Saudi Arabia, Owners to arrange, upon Charterers request 'special gear certificate for Saudi Arabia' issued by one of LR, ABS, BV, DNV, NKK and any expenses for issuing same to be for Charterers' account.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' agents to comply with the aforementioned regulations or because vessel is not in possession of such valid and up-to-date certificates of efficiency, then Charterers may suspend hire for the time thereby lost.

Clause No. 80
Owners guarantee that vessel is not blacklisted by any Arab League countries to the best of their knowledge.

Clause No. 81
All negotiation and eventual fixture to be kept private and confidential.

Clause No. 82

Charterers to pay US$ 1,500.00 per month pro-rata for this Time Charter covering all cables, communications, victualling, representation and entertainment.

Clause No. 83
Deleted.

Clause No. 84
Deleted.

Clause No. 85
Owners guarantee that vessel is not blacklisted in ports of call with POEA in good order.

Clause No. 86
For the purpose of computing hire payments, the time for delivery/redelivery shall be adjusted in GMT.

Clause No. 87
Owners guarantee vessel is SDSTBC and be grain fitted and suitable for loading full cargo of grain in bulk without bagging/strapping/securing.

Clause No. 88
The service of Ocean Routes may be engaged at Charterers' expenses to recommend optimum route and advise Master about weather en-route. Master shall be free to follow



**ADDITIONAL CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 9ᵀᴴ JANUARY, 2004**
**MV "WISDOM C" / VOC**

Ocean Routes recommendation and directions to route course and/or whether or not in accordance with the safety of the vessel and crew which are left entirely to his discretion. Charterers shall not be responsible in any way for Ocean Routes information, directions and recommendations which are provided as an assistance only and entirely without prejudice the Master shall prepare a deck log abstract for each sea passage showing daily noon position and all other information.

**Clause No. 89**
Owners should obtain and keep on board throughout this Charter a Certificate of Financial Responsibility to enable the vessel to trade to the United States and United States Territories at all times in full compliance with Federal Water Pollution Control Act as amended (Title 33 US Code) and the US Pollution Act 1990.

The Charterers shall be under no responsibility for all consequences (including loss of time) of lack in establishing or maintaining Financial Responsibility under the United States Oil Pollution Act 1990, Oil or other Pollution damage and failure or inability of the Owners to do so as provided for above and any loss of time incurred thereby to be off-hire unless these lack of Financial Responsibility and Pollution arose by reason of Charterers' negligence.

**Clause No. 90**
Charterers to have the right to use bulldozer fitted with rubber tyres in vessel's holds and/or similar equipments as deemed necessary by custom of the port with due consideration to tank top strengths under Master's supervision and discretion.

**Clause No.91**
Owners warrant that the vessel has on board the International Tonnage Certificate 1969 in full accordance with IMO Requirement and International Convention on Tonnage Measurement of Ships 1969.

**Clause No. 92**
Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, waybill of other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers behalf or on behalf of any sub Charterers) incorporating, were not compulsorily applicable, the Hamburg rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules, the Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**Clause No. 93**
Deleted.





ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

#### Clause No.94
Vessel is not to make direct calls between Taiwan and China, North and South Korea and vice-versa.

#### Clause No. 95 Safe Stowage and Trimming:
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expenses.

#### Clause No. 96
General average/Arbitration London, English Law applying.

#### Clause No. 97
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers, except as otherwise provided in this Charter Party. Loss, damage, expense or delay caused by failure on the part of "the company" to comply with the ISM Code shall be for the Owners' account.

#### Clause No. 98
Vessel to provide hold-wise separations only. Any artificial separations to be done at Charterers' time/expenses and risk in respect of any commingling and to be at Master's satisfaction.

#### Clause No. 99 Trading Exclusions Clause: -
Vessel to trade always between safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits and always via ice free ports, vessel not to force ice or follow ice breakers, exclude: - Denmark, Finland, Sweden, Norway, Angola (including Cabinda), Democratic Republic Congo (formerly Zaire), Eritrea, Israel, Liberia, Sierra Leone, Somalia, Sri Lanka, Bosnia-Herzegovina, Albania, Sea of Azov, Ethiopia, Mauritania, Cambodia, Cuba, North Korea, Alaska, Great Lakes, Canada, Australia, New Zealand, Tasmania, Iceland, Turkish occupied Cyprus, and all war zones but Conwartime 1993 War Risk Clause to apply to this Charter Party. Charterers are allowed to call Rijeka/Koper and Plomin. No direct sailing between PR China and Taiwan and vice versa.

Iraq: -
Charterers are allowed to trade Iraq with UN/US approved cargo(es) and to provide all relevant documentation proving that cargo(es) is legitimate and UN/US approved and to

18- 2-04;14:43  :LIGHTSHIP CHARTERING                    ;+45 45480770            # 202 01



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

fulfill the required procedure including clearing of naval checkpoints north and south
bound at their time/risk/expenses, failing which vessel to remain fully on-hire. In case
vessel stopped enroute for control by the multinational/US forces any time lost to be for
Charterers' account.

In the event of discharging cargoes in Libya, Nigeria, Yemen or Syria, then any cargo
shortages to be dealt with by Charterers without involving the Owners and Charterers to
be fully responsible for settlement of these claims which to be for their account.

Pacific CIS is permitted with the following Clause: -
Charterers to remain entirely responsible due to any incident whatsoever related to gypsy
moth including but not limited to detention or quarantine of the vessel. If the vessel is
immobilized or subject to any inspection by any authorities due to vessel's call at Pacific
CIS during this Charter Party or for any reason related to gypsy moth then vessel to
remain on-hire and Charterers to remain responsible for all the costs and consequences
thereof.
Prior sailing last port in Pacific CIS Charterers to provide Owners/vessel at their time and
expense, including any fumigation expenses including crew accommodation and
transportation if necessary, with a Phyto-sanitary Certificate from relevant competent
authorities which is acceptable for trading thereafter in USA/Canada confirming that the
vessel is free of any Asian gypsy moth infestation.

Clause No. 100
BIMCO DOUBLE BANKING CLAUSE

(A)  The Charterers shall have the right, where and when it is customary and safe for
     vessels of similar size and type to do, to order the vessel to go, lie or remain
     alongside another vessel or vessels of any size of description whatsoever or to
     order such vessels to come and remain alongside at such safe dock, wharf,
     anchorage or other place for transshipment, loading or discharging of cargo
     and/or bunkering.

(B)  The Charterers shall pay for and provide such assistance and equipment as may
     be required to enable any of the operations mentioned in this Clause safely to be
     completed and shall give the Owners such advance notice as they reasonably can
     of the details of any such operations.

(C)  Without prejudice to the generality of the Charterers' rights under (A) and (B), it
     is expressly agreed that the Master shall have the right of refuse to allow the
     vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not
     safe so to do.

T 7 n [?]

16- 2-04;14;43  ;LIGHTSHIP CHARTERING                                    ;+45 45480770    # 27/ 31



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

(D) The Owners shall be entitled to insure any deductible under the vessel's Hull
Policy and the Charterers shall reimburse the Owners any additional premium(s)
required by the vessel's underwriters and/or the cost of insuring any deductible
under the vessel's Hull policy.

(E) The Charterers shall further indemnify the Owners for any costs, damage and
liabilities resulting from such operation. The vessel shall remain on hire for any
time lost including periods for repairs as a result of such operation. .

Clause No. 101
DEDUCTION:
Charterers to immediately provide Owners with full details of any deductions for off-hire
made by Charterers and after being justified to be deducted from hire.

Clause No. 102
EXCLUSIONS:
Charterers not to sublet vessel during the Charter period to Nigerian, Haitian,
Nicaraguan, Pakistani, Israeli, Iraqi, Yugoslavian registered/based/controlled/owned
domiciled companies.

Charterers also not to sublet vessel to the companies based/owned/registered/controlled
domiciled in the countries against whom UN sanctions may be imposed from time to
time.

Clause No. 103
Excluded Port and Ice Clause: -
Vessel not to be ordered to nor bound to enter:

a) Any places where fever or epidemics are prevalent or to which the Master,
Officers and crew by law are not bound to follow vessel.

b) Any ice-bound port or place or any port or place where lights, lightships,
marks and buoys are likely to be withdrawn by reason of ice of vessel's arrival
or where there is risk that the vessel will not be able on account of ice to reach
the port or place or to depart therefrom completing loading and discharging. If
on account of ice the Master considers it dangerous to remain at the loading or
discharging port or place for tear of vessel being frozen in and/or damages, the
Master shall have liberty to sail to a convenient port or place and await
Charterers' fresh instruction.

c) The vessel shall not be obliged to force ice, not to follow ice-breakers.

18- 3-04;14:43   ;L;GHTSHIP CHARTERING                    ;=45 45480770    = =., = ..



### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

**Clause No. 104**
**LOADING STEEL PRODUCTS:**
Charterers to give prior notice of loading steel products in order Owners to appoint P & I
Club surveyor to conduct cargo condition survey and Charterers to also appoint their own
surveyor, each party bearing their own survey costs.
Removal of any dunnage/lashing materials/fittings will be undertaken by Charterers at
their time and expenses upon completion of voyage.

**Clause No. 105**
**NO PROCUREMENT:**
Charterers undertake that during the period of this Charter, they will not procure any
suppliers, necessaries or services, including port expenses and bunkers on the credit of
the Owners or in Owners name but that these will always be procured in the name of the
Charterers and shall always remain the responsibility of the Charterers.

**Clause No. 106**
Deleted.

**Clause No. 107**
**Bunker Quality Control Clause for Time Charters:**

A) The Charterers shall supply bunkers of a quality suitable for burning in the
vessel's engines and auxiliaries and which conform to the specification(s)
BSMA 100 1989 i.e., British Standards Marine Appendix 100 1989.

B) At the time of delivery of the vessel the Owners shall place at the disposal of
the Charterers, the bunker delivery note(s) and any samples relating to the
fuels existing on board.

C) During the currency of the Charter the Charterers shall ensure that bunker
delivery notes are presented to the vessel on the delivery of fuel(s) and that
during bunkering representative samples of the fuel(s) supplied shall be taken
at the vessel's bunkering manifold and sealed in the presence of competent
representatives of the Charterers and the vessel.

D) The fuel samples shall be retained by the vessel for 90 (ninety) days after the
date of delivery or for whatever period necessary in the case of a prior dispute
and any dispute as to whether the bunker fuels conform to the agreed
specification(s) shall be settled by analysis of the sample(s) by V.P.S. or by
another mutually agreed fuels analyst whose findings shall be conclusive
evidence as to conformity or otherwise with the bunker fuels specification(s).



## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC

E) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s).

Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause No. 108**
**Prolonged Stay at Ports:**
Should vessel stay in port more than 20 days and underwater growth has developed Owners will not be liable for loss of speed and/or increase of fuel consumption.

- US Anti Drug Abuse Act 1986 Clause for Time Charters.
- US Tax Reform 1986 Clause
- US Trade – Unique Bill of Lading Identifier Clause
- BIMCO Bulk Carriers Safety Clause.

## US ANTI DRUG ABUSE ACT 1986 CLAUSE FOR TIME CHARTERS:

A) In pursuance of the provisions of the US Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing un-manifested narcotic drugs and marijuana to be loaded or concealed on board the vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners the Master, and the crew of the vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' break of the provisions of this Clause shall be for the Charterers' account and the vessel shall remain on hire.

Should the vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the vessel is released and at their expenses put up bail to secure release of the vessel.

1ᵇ- 2-04;14:43  ;LIGHTSHIP CHARTERING                    1=43 45480770        # 27/ 8

## Lightship
### Chartering A/S
CVR 22910114

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9ᵀᴴ JANUARY, 2004
MV "WISDOM C" / VOC

The Owners shall remain responsible for all time lost and all expenses incurred, including Fines, in the event that un-manifested narcotic drugs and marijuana are found in the possession or effects of the vessel's personnel.

B) In pursuance of the provisions of sub-olause (A) above, the Owners and the Charterers warrant that they shall both become signatories to the sea carrier initiative agreement of signing this Charter Party or on delivery of the vessel under this Charter, whichever is the earlier, and will so remain during this currency of the Charter.

## US TAX REFORM 1986 CLAUSE:
Any US Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as the US Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this Charter Party which begins or ends in the United States, and which income under the Laws of the United States is treated as US Source Transportation Gross Income, shall be reimbursed by the Charterers.

## US TRADE- UNIQUE BILL OF LADING IDENTIFIER CLAUSE

The Charterers warrant that each transport documents accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading identifier as required by the US Customs Regulations (19 CRF part 4 section 4.7 A) including subsequent changes amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

## BIMCO BULK CARRIER SAFETY CLAUSE:
(A)  The Charterers shall instruct their terminal operators or their representatives to co-operate with the Master in completing the IMO ship/shore safety checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)  In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct their terminal to load/discharge the vessel in accordance with the loading/discharging plan,

Wisdom C 2949 TC VOC 090104                    - 23 -

18-2-04:14:43    :LIGHTSHIP CHARTERING                                              1-45 45480770    + 20, 0.

**Lightship**
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC

which shall be approved by the Master with due regard to the vessel's draught,
trim, stability stress or any other factor which may affect the safety of the vessel.

(C) At any time during cargo operations the Master may, if he deems it necessary for
reasons of safety of the vessel, instruct the terminal operators or their
representatives to slow down or stop the loading or discharging.

(D) Compliance with the provisions of the Clause shall not affect the counting of
laytime.

Clause No. 109
Multiple Bills of Lading:
In case of multi port/receivers Bill(s) of Lading vessel/Master not to be responsible for
the distribution of the cargo in various receivers but for the aggregate cargo loaded.

Clause No. 110
US Oil Pollution Liability Legislation – Certificates of Financial Responsibility.
A) Notwithstanding anything whether printed or typed herein to the contrary,
Owners are not to be responsible for any failure or inability of their part to
comply with any warranties and/or guarantee given by them and/or any
obligations imposed upon them under this Charter or any Bill of Lading issued
pursuant to it resulting from any change in US.

Legislation and/or regulations and/or decrees and/or certification requirements
taking effect after the date of this Charter. Any action taken by Owners to
perform the Charter and/or any Bills of Lading issued pursuant to it as a result of
such changed circumstances shall be at Charterers' risk and expense.

B) Charterers agree to indemnify Owners for any liability which Owners may incur
to third parties as a result of their failure and/or inability in the changed
circumstances referred to in the first paragraph of this Clause to perform their
obligations under the Charter and/or any Bills of Lading issued pursuant to it and
Charterers warrant that the terms of this Clause will be effectively incorporated
into any Bill of Lading issued pursuant to this Charter.

Clause No. 111
US Customs 24 Hours Rule Clause for Time Charter Parties;
(A) If loading cargo destined for the US or passing through US ports in transit, the
Charterers shall:

I)    Provide all necessary information, upon request by the Owners, to the
Owners and/or their agents to enable them to submit a timely and accurate cargo
declaration directly to the US Customs; or

070 F°.



**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**

II)    If permitted by US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be submitted to the US Customs latest 24 hours in advance of loading.

(B)   The Charterers assume liability for and shall indemnify defend and hold harmless the Owners against any loss and/or damage whatsoever nature (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (A).

(C)   If the vessel is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (A), the Charterers shall provide a bond or other security to ensure the prompt release of the vessel. Notwithstanding any other provision in this Charter Party to the contrary, the vessel shall remain on hire.

Clause No. 112
US Security Clause for Time Chartering:
If the vessel calls in the United States, including any US territory, the following provisions shall apply with respect to any applicable Security Regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to Security Regulations or measures required by any US authority including, but not limited to, security Guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

Clause No. 113
US Customs – Trade Partnership against Terrorism (C-TPAT) Clause:
In case the Charterers have signed the C-TPAT Agreement with the US Customs service. The Owners, Master and crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreements signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and crew harmless for any claims made against the Owners, Master and crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.



**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**

Clause No. 114
Nigerian Clause:
Charterers to arrange and pay for NPA/SBN.
If NPA/SBN is not obtained prior to vessel's entering Nigerian territorial waters then
vessel to stay off Nigerian territorial waters. All consequences and/or damages and/or
expenses to be fully for Charterers' account and vessel to remain on full hire.

Clause No. 115
USDA/NCB Clause:
Owners guarantee that vessel meets all national cargo Bureau/United States Department
of Agriculture Plant Protection and Quarantine Office Regulations.

Clause No. 116
War Risk Clause
  A) Charterers shall pay to Owners any increase in premium or call and/or any
     additional premium payable during the currency of this Charter to war risk
     underwriters and/or to any mutually war risks association for the war risks
     insurance of the vessel, her officers and crew including insurance of detention and
     diversion expenses and insurance against the risks of blocking and trapping.
  B) Charterers shall reimburse Owners the premia and calls referred to in the
     proceeding sub-clause immediately upon presentation to them of the premium debit
     notes from the vessel's war risk underwriters and/or mutually war risks association.
  C) The Owners, Master and crew shall be entitled to follow all and any instructions
     or directions which may be given to the vessel's war risks underwriters or mutual
     war risks association.
  D) Charterers shall pay crew war risk bonuses.

Clause No. 117
For any disputes under US$ 100,000 Arbitration to be conducted under LMAA Small
Claims Procedure.

---oOo---

16- 2-04;14:43 ;LIGHTSHIP CHARTERING

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED COPENHAGEN, 9TH JANUARY, 2004 MV "WISDOM C" / VOC



### NEW BOTH-TOBLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America the following Clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or servants of the carrier in the navigation or in the management of the ship, the Owners of goods carried hereunder will indemnify the carrier against all loss or liability to the other non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply: -

### NEW JASON CLAUSE

In the event of accident, danger, damage, or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute. Contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the Goods to the carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.



### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

#### QUESTIONNAIRE

PLS NOTE ABV VSL IS NEW PURCHASE AND NOT DELIVERED TO HEAD-OWNERS YET
SO, DIFFICULT TO FILL OUT WHOLE QUESTIONARE.

A. SPECIFICATIONS

1) VESSELS NAME: MV 'WISDOM C'

2) FORMER NAME: EX-NAME: MACEDONIA HELLAS

3) TYPE OF VESSEL: BULKCARRIER

4) FLAG: PANAMA

5) SHIPYARD/YEAR AND MONTH THE VESSEL WAS BUILT: 1981/BRAZIL

6) LOA (MTRS)/LPP (MTRS): 200,9 M

7) BEAM (MTRS): 27,20M

8) DEPTH MOULDED (MTRS): 15,20 M

9) INTERNATIONAL GRT/NRT: 23.381/12.534

10) SUEZ CANAL GRT/NRT: 24.476/19.766,21

11) PANAMA CANAL GRT/NRT: 24.591,86/18.930,46

12) SUMMER DWAT (MTS) ON MAX. SUMMER DRAFT (MTRS):40204 MT / 11.19 M

13) WINTER DWAT (MTS) ON MAX. WINTER DRAFT (MTRS): 38000 MT / 10.75 M

14) PANAMA DWAT (MTS) ON MAX. PANAMA DRAFT (MTRS): REVERTING

15) SUMMER TPC/TPI: 47 MT

16) WINTER TPC/TPI: REVERTING

17) GRAIN/BALE (CUBIC BREAKDOWN OF ALL COMPARTMENTS IN CBM):

|       | GRAIN | BALE  |
|-------|-------|-------|
| NO.1  | 4946  | 4645  |
| NO.2  | 8638  | 8120  |
| NO.3  | 5488  | 5155  |
| NO.4  | 8689  | 8165  |
| NO.5  | 5488  | 5155  |
| NO.6  | 8694  | 8170  |
| NO.7  | 5256  | 4940  |
| TOTAL | 47199 | 44350 |

00.0 ℅

18- 2-04;14:45  ;LIGHTSHIP CHARTERING                    ;~45 45480770    # 39/ 3/



**ADDITIONAL CLAUSES TO CHARTER PARTY.**
**DATED COPENHAGEN, 9TH JANUARY, 2004**
**MV "WISDOM C" / VOC**

18) NUMBER OF HOLDS, INCLUDING DIMENSIONS
   (LENGTH X BREADTH X HEIGHT):
HOLD DIMS:
NO.1: 15,80 X 19,00 AFT/12,60 FORE
NO.2: 25,20 X 19,00
NO.3: 15,60 X 19,00
NO.4: 25,20 X 19,00
NO.5: 15,60 X 19,00
NO.6: 25,20 X 19,00
NO.7: 15,80 X 19,00 FORE/16,00 AFT

19) NUMBER OF HATCHES, INCLUDING DIMENSIONS:
HATCH DIMS:
NO. 1/3/5/7 : 9,6 X 12,64
NO. 2/4/6  : 17,6 X 12,64

20) TYPE OF HATCH COVERS: MACGREGOR FOLDING

21) AA) FLAT TANKTOP DIMENSIONS IN MTRS: REVERTING
    BB) STRENGTH ON TANKTOP PER SQM: 22.5 MT/SQM

22) STRENGTH ON HATCH COVERS PER SQM: 1,6 MT/SQM

23) DECK SPACE WITHOUT OBSTACLES: REVERTING

24) AA) NUMBER/CAPACITY AND TYPE OF CRANES/DERRICKS:
       3 CRANES X 20T, 2 CRANES X 25T
    BB) HOISTING SPEED AT FULL WORK LOAD - HALF WORK LOAD - NO WORK
LOAD: REVERTING
    CC) SLEWING SPEED AT FULL WORK LOAD - HALF WORK LOAD - NO WORK
LOAD: REVERTING
    DD) TOPPING SPEED AT FULL WORK LOAD - HALF WORK LOAD - NO WORK
LOAD: REVERTING

25) LOCATION OF CRANES/DERRICKS: REVERTING

26) VESSELS CALL SIGN: REVERTING

27) PORT OF REGISTRY AND REGISTRY NO.
   PORT OF REIGSTRY: PANAMA
   REGISTRY NUMBER: REVERTING

28) VESSELS CLASSIFICATION SOCIETY: REVERTING

29) VESSELS CLASS: R.M.S. ( RUSSIAN MARITIME SHIPPING )

30) VALIDITY PERIOD OF VESSELS CLASS CERTIFICATE: REVERTING
   (COPY OF VESSELS CLASS CERTIFICATE TO BE FAXED TO OUR OFFICE)

31) P+I CLUB: THE LONDON STEAMSHIP OWNER'S MUTUAL ASSOCIATION LTD
   (COPY OF THE ENTRY CERTIFICATE TO BE FAXED TO OUR OFFICE)

TCO 79



**Lightship**
Chartering A/S
DVR 88050154

### ADDITIONAL CLAUSES TO CHARTER PARTY
### DATED COPENHAGEN, 9TH JANUARY, 2004
### MV "WISDOM C" / VOC

32) DISTANCE FROM WATERLINE TO TOP OF HATCH COAMING
   (ALL BELOW MENTIONED INFO REVERTING)
   AA) IN HEAVY BALLAST CONDITION:
   BB) IN LIGHT BALLAST CONDITION:

33) DISTANCE FROM WATERLINE TO HIGHEST POINT
   AA) IN HEAVY BALLAST CONDITION:
   BB) IN LIGHT BALLAST CONDITION:
   CC) IN LADEN CONDITION

34) AA) DISTANCE FROM TANKTOP TO UNDERSIDE OF CLOSED HATCH COVERS:
   BB) DISTANCE FROM TANKTOP TO UNDERSIDE WEATHERDECK:
   CC) DISTANCE FROM TANKTOP TO UNDERSIDE TWEENDECK:
   EE) DISTANCE FROM TWEENDECK TO UNDERSIDE WEATHERDECK:
   FF) DISTANCE FROM TOP OF HOPPER TO UNDERSIDE WEATHERDECK:
   GG) DISTANCE FROM TOP OF HOPPER TO BOTTOM OF WING TANKS:
   HH) DISTANCE FROM SHIP'S RAIL TO INSIDE OF HATCH COAMING:
   II) DISTANCE FROM DECK TO UNDERSIDE OF CRANE PEDESTAL:
   JJ) DISTANCE FROM DECK TO TOP OF HATCH COVER:
   KK) DISTANCE FROM HATCH COVER TO UNDERSIDE OF CRANE-JIB:

35) VESSELS FULL TANK CAPACITY IN MTS FOR
   AA) IFO: 2200 MT
   BB) MDO: 270 MT
   CC) FRESH WATER:

36) CONSTANTS EXCLUDING FRESHWATER: REVERTING

37) QUANTITY OF FRESHWATER ON BOARD: REVERTING

38) FRESHWATER EVAPORATOR? REVERTING
   IF YES PLEASE ADVISE DAILY PRODUCTION IN MTS:

39) ARE VESSEL'S HOLDS FREE OF OBSTRACTIONS? YES.

40) IS VESSEL SUITABLE FOR GRABDISCHARGE? REVERTING

41) DOES THE VESSEL HAVE GRABS ON BOARD? NO

42) IS THE VESSEL GRAINFITTED? YES

43) IS THE VESSEL CO2 FITTED? : YES

44) IS THE VESSEL SUEZ/PAMANA CANAL FITTED? YES

45) HOLD VENTILATION (NATURAL OR ELECTRIC)?: NATURAL

46) VESSELS ICE CLASS/STRENGTHENED: NO

47) DOES THE VESSEL HAVE AUSTRALIAN HOLD LADDERS? NO

48) IS THE VESSEL CONTAINER FITTED (IF YES PLEASE ADVISE CONTAINER



**Lightship**
Chartering A/S
DVR 8013114

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED COPENHAGEN, 9TH JANUARY, 2004
## MV "WISDOM C" / VOC

CAPACITY)? NO

49) IS THE VESSEL ITF FITTED? POEA (PHILIPPINES OVERSEAS EMPLOYMENT
AGREEMENT)

50) PERMANENT STANCHIONS ON DECK?: NO

51) CLOSED RAIL?: REVERTING

52) IS THE VESSEL FULLY LOGS FITTED FITTED INCLUDING ALL LASHING
MATERIALS AND STANCHIONS REQUIRED FOR A FULL CARGO OF LOGS UNDER/ON
DECK? NO

53) VESSEL'S TELEX NO.(S): REVERTING

54) VESSEL'S PHONE NO.(S): REVERTING

55) VESSEL'S FAX NO.(S): REVERTING

56) VESSEL'S E-MAIL NO.(S): REVERTING

57) VESSEL'S LAST SIX CARGOES: REVERTING

58) VESSEL'S LAST SPECIAL SURVEY (WHEN/WHERE AND NATURE OF WORK
PERFORMED): REVERTING

59) VESSEL'S LAST DRYDOCK (WHEN/WHERE AND NATURE OF WORK PERFORMED):
REVERTING

60) VESSEL'S CASUALITY AND POLLUTION HISTORY: REVERTING
COLLISIONS, GROUNDINGS, POLLUTION, (OIL/BUNKER SPILLS AND OTHERS)
FIRE, CARGO DAMAGE ETC.OVER THE LAST TWO YEARS:

61) HAS THE VESSEL BEEN ARRESTED IN THE PREVIOUS 12 MONTHS?: REVERTING
(IF YES PLEASE ADVISE DETAILS)

62) LAST PORT STATE CONTROL INSPECTION: REVERTING
WHEN:              WHERE:
PROBLEMS IF ANY:
VESSEL PASSED WITHOUT RECOMMENDATION OR DETENTION?

63) HULL AND MACHINERY INSURED WITH: BRITANNIA
INSURED VALUE: USD 4.5 MIO

64) COLLISION INSURANCE INSURED WITH: REVERTING
INSURED VALUE: REVERTING

65) LAY-UP: HAS VESSEL BEEN IN LAY-UP (WHEN/WHERE/PERIOD): REVERTING

66) WARRANTIES: REVERTING
AA) OWNERS WARRANT THAT VESSEL WILL NOT BE SOLD FOR SCRAP AFTER
THIS VOYAGE/PERIOD



**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**

67) MASTER'S NAME AND NATIONALITY: LUPULESCU ANDRIAN/ROMANIAN

68) NUMBER AND NATIONALITY OF THE CREW: PHILIPPINO/EGYPTIAN - NUMBER
   REVERTING.

69) PLEASE CONFIRM THAT MASTER AND CREW ARE SPEAKING FLUENT ENGLISH: YES

70) PLEASE ADVISE EMPLOYMENT OF CREW AND OFFICER : REVERTING
   (OWNER/MANAGER/CREWING AGENCY):

SPEED AND CONSUMPTION, WHICH OWNERS GUARANTEE VESSEL WILL MAINTAIN
DURING THE WHOLE CURRENCY OF THIS CHARTER PARTY:

1) SPEED AND CONSUMPTION IN FULLY LADEN CONDITION:
   ABT 12K ON ABT 31,00 MT IFO 180 CST PLUS 3 MT MDO - LADEN

2) SPEED AND CONSUMPTION IN BALLAST CONDITION:
   ABT 12K ON ABT 30,00 MT IFO 180 CST PLUS 3 MT MDO - BALLAST

3) ECONOMICAL SPEED AND CONSUMPTION: NIL

4) CONSUMPTION IN PORT:
      AA) GEAR IDLE: PORT IDLE 2,5 MT MDO
      BB) GEAR WORKING 8 HOURS: REVERTING
      CC) GEAR WORKING 24 HOURS: REVERTING

5) BUNKER SPECIFICATIONS: REVERTING

1)NAME/ADDRESS AND CONTACTABLE NOS. OF REGISTERED OWNERS:
   REVERTING

2) NAME/ADDRESS AND CONTACTABLE NOS. OF MANAGERS: REVERTING

3) NAME/ADDRESS OF DISPONENT OWNERS OR TIMECHARTER OPERATORS:
   : PAN OCEAN SHIPPING CO LTD

4) HOW LONG HAS VESSEL BEEN IN CURRENT OWNERSHIP?: REVERTING
   (IF LESS THAN 2 YEARS PLEASE ADVISE FORMER OWNERS STYLE AND TIME
   VESSEL WAS WITH THAT OWNERSHIP)

5) OWNERS BANK ACCOUNT:

OWNERS' BANK STYLE ASF:-
KOREA EXCHANGE BANK(SWIFT CODE:KOEXKRSE)
TAEPYONGNO BRANCH, SEOUL, KOREA
A/C NO. 544-7-70599 WITH JP MORGAN CHASE BANK, NEW YORK
BENEFICIARY : PAN OCEAN SHIPPING CO, LTD. A/C NO.063-JCD-100120

ᏕᏟᏟᏞᏔ

18- 2-04;14;45    ;LIGHTSHIP CHARTERING

**ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 9TH JANUARY, 2004
MV "WISDOM C" / VOC**



6) NAME AND TELEX/FAX/E-MAIL NUMBER OF THE PERSON, WHO SHOULD BE
   INFORMED ABOUT HIRE PAYMENTS: REVERTING

7) OWNERS TO ADVISE VALIDITY PERIOD OF THE FOLOWING CERTIFICATES:
   ALL BELOW REVERTING
   AA) SAFETY EQUIPMENT CERTIFICATE
   BB) SAFETY CONSTRUCTION CERTIFICATE
   CC) SAFETY RADIO CERTIFICATE
   DD) SAFETY GEAR CERTIFICATE
   EE) INTERNATIONAL LOADLINE CERTIFICATE
   FF) DERAT CERTIFICATE
   GG) OPA/COFR CERTIFICATE
   HH) ITF CERTIFICATE

8) OWNERS TO FAX A COPY OF THE ABOVE MENTIONED CERTIFICATES AND OF
   THE RELEVANT DOCUMENT OF COMPLIANCE AND SAFETY MANAGEMENT CERTIFICATE
   TO:

9) PLANS/SUEZ CANAL TONNAGE CERTIFICATE TO BE AIRFRIGHTED TO
   CHARTERERS AS FOLLOWS: REVERTING
   AA) 1 COPY GENERAL ARRANGEMENT PLAN
   BB) 1 COPY CAPACITY PLAN
   CC) 1 COPY OF SUEZ TONNAGE CERTIFICATE

10) MANUFACTURERS SPECIFICATIONS FOLLOWED FOR: REVERTING
    AA) ENGINE ROOM MACHINERY
    BB) DECKSIDE MACJINERY

11) PLANNED MAINTENANCE SYSTEM IN PLACE FOR: REVERTING
    AA) ENGINE ROOM EQUIPMENT        GG) ACCOMODATION
    BB) NAVIGATION EQUIPMENT         HH) HOLDS AND HATCHES
    CC) DECK EQUIPMENT               II) CRANES (IF APPLICABLE)
    DD) RADIO EQUIPMENT              JJ) BALLAST TANKS
    EE) SAFETY EQUIPMENT             · KK) HULL AND DECK
    FF) FIRE FIGHTING EQUIPMENT         LL) MOORING EQUIPMENT

12) PLEASE DETAIL ANY OTHER MAINTENANCE SYSTEMS THAT YOUR COMPANY
    UTILISES OR OTHER AREAS OF THE VESSEL THAT YOUR COMPANY COVERS.
    REVERTING

SEO<sup>®</sup>

# EXHIBIT B

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN:

VOC BULK SHIPPING (USA) INC.
of the United States of America

Claimants
(Owners)

and

RENSSELAER IRON & STEEL, INC.
of the United States of America

Respondents
(Charterers)

### "WISDOM C" C/P dd 26.10.04

### FINAL AWARD

**WHEREAS:**

(A)    By a time charter fixture on the NYPE form, with amendments, dated 26 October 2004 as reflected by a recap message of that date, the claimants ("the owners") chartered to the respondents ("the charterers") the ship "Wisdom C" (of which the claimants were in fact disponent owners) for a trip on terms and conditions more particularly set out therein.

(B)    Clause 17 of the charter upon which the fixture was based and which was incorporated therein provided for any disputes arising thereunder to be referred to arbitration in London with English law to apply, in a manner more particularly set out therein.

(C)    A dispute having arisen, the owners in due course appointed me, the undersigned Alan Oakley of Hoy's Farm, Upwick, Ware, Hertfordshire SG11 2LD and the charterers appointed me, the undersigned Mark Hamsher of 18c Ensign Street, London E1 8JD as arbitrators respectively. In due course the said arbitrators appointed me, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London WC1V 6DR as third arbitrator. We all accepted appointment on the basis of the LMAA Terms (2002) which accordingly applied to this reference. The seat of the arbitration is London.

(D)    The dispute referred to us concerned the owners' claim for a balance on the hire accounts in the sum of US$177,023.03 and for a declaration of entitlement to be indemnified in respect of a claim for $9,778.50 for gangway guards, liability for both of which the charterers denied.

(E)    The owners' solicitors and the charterers respectively provided us with written submissions and copies of the documents upon which they relied. Neither party requested an oral hearing or a reasoned Award.

**NOW WE,** the said Alan Oakley, Mark Hamsher and Bruce Harris, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us, and having given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL AWARD** as follows:

1.    **WE FIND AND HOLD** that the owners' claim for $177,023.03 succeeds in full.

2

2.    **WE THEREFORE AWARD AND ADJUDGE** that the charterers shall forthwith pay to the owners the sum of US$177,023.03 (One hundred and seventy-seven thousand and twenty-three United States Dollars and three cents) together with interest thereon at the rate of 9.25% (nine and one quarter per cent) per annum, compounded at three-monthly rests, from 15 January 2006 down to the date of payment hereunder.

3.    **WE FURTHER AWARD AND DIRECT** that the charterers shall bear and pay their own and (on the standard basis) the owners' costs of this reference (and we reserve to ourselves the right to assess and make a further Award in respect of the amount of such costs), together with the costs of this Award which we hereby fix in the sum of £6,615 (Six thousand six hundred and fifteen Pounds Sterling) **PROVIDED** that if, in the first instance, the owners shall have paid any amount in respect of the costs hereof they shall be entitled to immediate reimbursement from the charterers of the sum so paid.

4.    **WE FURTHER AWARD AND DIRECT** that the charterers shall pay the owners interest on the sums in paragraph 3 above at the rate of 7.50% (seven and one-half per cent) per annum compounded at three-monthly intervals from the date hereof in the case of the owners' costs and from the date of any payment by the owners to us in respect of the costs hereof until, in each case, the date of payment by the charterers to the owners of the sums in question.

5.    **WE RESERVE** for later determination by ourselves owners' claim for an indemnity: to that extent this Award is interim in the reference, but it is **FINAL** as to what it decides.

3

**GIVEN** under our hands this 5 day of January , 2008

Alan Oakley

Witness

Mark Hamsher

Witness

Bruce Harris

Witness

4

# EXHIBIT C

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

VOC BULK SHIPPING (USA) INC.
of the United States of America                    <u>Claimants</u>
                                                    (Owners)

and

RENSSELAER IRON & STEEL, INC.
of the United States of America                    <u>Respondents</u>
                                                    (Charterers)

**"WISDOM C"**

**Charterparty dated 26th October 2004**

**Award on Costs**

**WHEREAS:**

1. By a Final Arbitration Award dated 3rd January 2008, to which we refer for its full terms and effect, we awarded the Owners the sum of US$177,023.03 together with interest and costs (such costs to be settled by us in the event of non-agreement by the parties).

2. By section 63 of the Arbitration Act 1996 we have power to determine by award the amount and basis of such recoverable costs.

3. On 15th February 2008, the Owners' solicitor made an application for the assessment of their clients' costs in the sum of £13,584.08. The solicitor's application included a bill of costs which included the number of hours charged and the applicable costs and disbursements.

4. On 18th February, we notified the Charterers that if they opposed any of the Owners' costs, they should let us know the reasons by latest 25th February. However, we received no response and on 27th February, we notified the Charterers that we were proceeding with our assessment of the Owners' costs.

5. The Owners have sought to recover the costs of their solicitor, MFB Solicitors of London, in the sum of £13,584.08. However, despite being given an opportunity to do so, the Charterers failed to participate in this assessment of costs. Therefore, in the absence of any objections on the part of the Charterers to the bill of costs presented, we are entitled to assume that they have no objections. Notwithstanding this, the fact that no formal objections have been taken to the Owners' costs does not relieve us from the responsibility to certify that the costs are fair and reasonable and in accordance with the principles of assessment of costs under English law.

6. We have determined that the Owners' costs are to be assessed on the standard basis as set out in section 63 of the Arbitration Act 1996; namely, that they are a reasonable amount which has been reasonably incurred, with any doubt being resolved in favour of the Charterers.

7. MFB Solicitor's bill of costs comprised the following:

Hourly rates:

| | |
|---|---|
| Partner | @ £245 - £275 |
| Senior Solicitor | @ £195 |
| Solicitors | @ £165 |

3

Hours charged:

| | | |
|---|---|---|
| Partner | 18 hours 21 minutes | £ 5,091.67 |
| Senior Solicitor | 3 hours 30 minutes | £    682.50 |
| Solicitors | 18 hours 11 minutes | £ 3,000.25 |
| Total | | £11,189.08 |

Correspondence costs:

Routine correspondence was charged at $1/10^{th}$

the hourly rates.                                        £ 2,414.66

Disbursements:

| | | |
|---|---|---|
| Arbitrator's appointment fee | £  125 | |
| Arbitrators' interlocutory costs | £1,460 | |
| Costs Draftsman | £  810 | £ 2,395.00 |
| | | ------------- |
| Total | | £13,584.08 |

8. We shall first deal with the hourly rates charged by MFB Solicitors. We consider that the hourly rates charged are reasonable and compare favorably with the rates charged by maritime solicitors in the United Kingdom. We also accept correspondence costs charged at $1/10^{th}$ the hourly rates.

9. MFB Solicitors charged for slightly more than 40 hours work. However, given the nature of the case, we think this is excessive. In addition, we are not sure what contribution the Senior Solicitor would have made to the case given that he only charged for 3 hours 30 minutes. We also notice that in addition to the Partner spending more than 18 hours on the case, he had assistance from 2 Solicitors for more than 18 hours. Having considered the matter, we shall allow the following hours:

| | | |
|---|---|---|
| Partner (at average £260 per hour) | 15 hours | £ 3,900 |
| Solicitors | 15 hours | £ 2,475 |

4

10. We accept the disbursement charges in full.

11. We have therefore calculated the Owners' costs as follows:

| Hours charged | £  6,375.00 |
| Correspondence costs | £  2,414.66 |
| Disbursements | £  2,395.00 |
| Total | £ 11,184.66 |

12. We have therefore awarded the Owners their costs in the sum of £ 11,184.66.

**NOW WE,** the undersigned Alan Oakley, Mark Hamsher and Bruce Harris, having taken upon ourselves the burden of this arbitration and having carefully and conscientiously considered the submissions provided by the Owners and in the absence of any submissions from the Charterers despite them having been given adequate opportunity to provide such submissions, do hereby make, issue and publish this our Award on Costs as follows:

**WE ASSESS AND DETERMINE** the Owners' costs on the basis set out in section 63(5) of the Arbitration Act 1996 in the total amount of £11,184.66 and no more;

**WE THEREFORE AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the said sum of £11,184.66, together with interest on the said sum at the rate of 7.5% per annum or pro rata compounded at three monthly rests from 3rd January 2008; and

**WE FURTHER AWARD AND ADJUDGE** that the Charterers shall bear and pay the costs of this Award on Costs which we hereby determine and assess in the sum of £2,310 inclusive of our fees and interlocutory charges in relation hereto, provided always that if, in the first instance, the Owners shall have paid any amount in respect of the costs of this Award they shall be entitled to immediate reimbursement by the Charterers of any sum or sums so paid, together with interest thereon at the rate of 7.5% per annum or pro rata compounded at three monthly rests from the date of payment by the Owners to us until the date of reimbursement.

5

GIVEN under our hands this *10 th* day of *March* 2008

Alan Oakley

Witness

Mark Hamsher

Witness

Bruce Harris

Witness